**UNITED GAS PIPE LINE COMPANY,**
Petitioner,

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent.**

No. 79–1903.

United States Court of Appeals,
Fifth Circuit.

June 12, 1980.

Rehearing Denied July 30, 1980.

Irving Jacob Golub, Stephen A. Wakefield, Cecil W. Talley, Houston, Tex., for petitioner.

Andrew M. Zack, Atty., F.E.R.C., Washington, D. C., for respondent.

William T. Miller, Stanley Balis, Washington, D. C., for United Municipal Distributors Group.

J. David Mann, Jr., Washington, D. C., for Laclede Gas Co.

Peter H. Schiff, Albany, N. Y., Richard A. Solomon, Washington, D. C., for Public Service Commission of the State of New York.

Before CHARLES CLARK, RONEY and GARZA, Circuit Judges.

CHARLES CLARK, Circuit Judge:

In this appeal we are asked to review an opinion of the Federal Energy Regulatory Commission ["Commission"] that determined the reasonableness of rates for the United Gas Pipe Line Company ["United"] during three rate periods. We find that the Commission's action is supported by the facts and by sound ratemaking principles. United has not demonstrated that the Commission's rate order is unjust or unreasonable. We affirm.

I

United became a wholly-owned subsidiary of the Pennzoil Company in 1968. Pennzoil, a natural resource company, engages in oil and gas exploration and production, in processing, refining, and marketing oil and gas and refined petroleum products, and in mining. United owns and operates an extensive interstate pipeline system from which it makes sales of natural gas to other pipelines, to city gate customers, and to direct industrial users.

In 1974, Pennzoil began to believe that the Federal Power Commission's[1] regulatory treatment of affiliated producers and pipelines was putting it at a competitive disadvantage. Accordingly, Pennzoil determined to consummate several financial

---

1. On October 1, 1977, the Federal Power Commission ceased to exist and most of its regulatory responsibilities were transferred to the Federal Energy Regulatory Commission. Both are referred to herein simply as the Commission.

transactions by which it would disaffiliate or "spin off" United. On March 13, 1974, United declared as a dividend to its parent one million shares of 9¾% Cumulative First Preferred Stock with a par value of of $100 per share. This stock was placed in a voting trust pending sale to third parties. The next day, Pennzoil declared a dividend to its shareholders of all the common stock of United. Pennzoil simultaneously made a $15 million equity contribution to United by forgiving $10 million of debt and $5 million of income tax liability. In addition, United agreed to establish a purchase fund and a sinking fund which, under certain conditions, would result in United's repurchase of the preferred stock.

After learning of these transactions, the Commission ordered an investigation of the spin-off on May 14, 1974, pursuant to its authority under section 14 of the Natural Gas Act, 15 U.S.C. § 717m. The Commission wanted to investigate the impact of the spin-off upon United's financial strength and current and future gas supply and to determine whether these transactions violated sections 7(b) and 12 of the Natural Gas Act, 15 U.S.C. §§ 717f(b) & k.

Some months later, hearings commenced before Presiding Administrative Law Judge Zwerdling at which Pennzoil, United, the Commission Staff, and a number of intervenors presented evidence. Once the facts had been developed on the record, the active parties, with the exception of the Commission Staff, entered into settlement negotiations that culminated in a proposed agreement. After further hearings, in which the Commission Staff did participate, Judge Zwerdling recommended the approval of the spin-off settlement. On November 28, 1975, the Commission affirmed the initial decision, approved the settlement, and terminated the investigation. The Commission's Order became final and no longer subject to judicial review on December 29, 1975.

Under the terms of the settlement, the entire transaction was to be rescinded by cancellation of the stock and refund of all funds paid by both parties. Accordingly, on December 30, 1975, Pennzoil transferred to United the entire $100 million of preferred stock and returned to United $15,139,583, representing all amounts received as dividends on that stock. At the same time, United cancelled the preferred stock certificates and returned to Pennzoil the $15 million equity capital contribution. Thus, by December 30, 1975, United was returned to the status quo of the period prior to March 13, 1974, with the exception that United was now independent of Pennzoil.

During the pendency of the spin-off, investigation, and settlement, United had filed three successive rate increases for jurisdictional service under section 4 of the Natural Gas Act, 15 U.S.C. § 717c. Pursuant to its powers under that section, the Commission suspended each of the filings for the statutory period; at the end of each period, the rates became effective subject to refund. The dates for these three locked-in periods roughly coincide with the period from the spin-off to its settlement. The rate filed in FPC Docket No. RP74–20 was in effect from April 6, 1974, to October 31, 1974; the rate filed in FPC Docket No. RP74–83 was in effect from November 1, 1974, to May 19, 1975; the rate filed in FERC Docket No. RP75–30 was in effect from May 20, 1975, to December 14, 1975.

The Commission consolidated the proceedings in Docket Nos. RP74–20 and RP74–83, which involved the same facts, and in Opinion No. 815 approved a settlement that the parties had certified to it. Under the terms of that settlement, which applied to the period from April 6, 1974, to May 19, 1975, United was entitled to a stipulated overall rate of return of 10.15%, based on a cost of debt of 8.9%, a cost of 9.75% on the preferred stock, and a return of 14% on common equity.[2]

---

2. The settlement in the consolidated docket, referred to as RP74–20/83, provided for the

following capitalization and returns:

In the meantime, proceedings were continuing in Docket No. RP75–30, concerning the third part of the locked-in period, May 20 to December 14, 1975. After a settlement of the majority of the issues in the case, Presiding Administrative Law Judge Lande held hearings and, on October 14, 1977, rendered an initial decision. He decided that the spin-off settlement could affect but did not purport to determine the appropriate rate of return. Therefore, the subsequent rescission of the preferred stock and the return of the dividends did "not mean that the preferred stock is to be considered never to have existed." In Judge Lande's view, the $100 million was properly classified as preferred stock for ratemaking purposes. Treating the capital structure as comprising $212,487,000 in debt, $100 million in preferred stock, and $93 million in common equity, he found that a return of 15% on that common equity "represents a rate of return for this [locked-in] period sufficient to allow United to continue to attract capital and to maintain its financial integrity." As for the preferred stock, Judge Lande found that United had enjoyed a "double recovery": the rate in effect during the period had permitted it to collect from its ratepayers sufficient funds to pay the 9.75% dividend, but pursuant to the spin-off settlement it had recovered those dividends back from Pennzoil. He therefore allowed a zero rate on the preferred equity to prevent United from recovering the cost of the dividends a second time. The cost of debt was agreed to be 7.92%. Thus the overall rate of return allowed was 7.59%.[3]

Ostensibly in light of Judge Lande's treatment of the cost of the preferred stock, which was at variance with the Commission's treatment of the same situation in the earlier docket, RP74–20/83, the Commission on rehearing issued Opinion No. 815–A, in which it decided to reopen the question of the reasonableness of the rate of return and to defer action on that question pending resolution of the rate of return issue in RP75–30, which United by this time had appealed to the Commission.

In Opinion No. 16, issued July 3, 1978, the Commission affirmed the Initial Decision of Judge Lande. It agreed that the $100 million was properly classified as preferred equity that should be costed at zero. The Commission, however, did not employ Judge Lande's reasoning that the preferred stock had an actual cost of 9.75% but had to be costed at zero to avoid a double recovery. Instead, it held that the net cost of the preferred stock was in fact zero because the dividends paid out by United were subsequently returned to United. The Commission affirmed the trial court's determination that a rate of return of 15.00% on $93 million of common equity was reasonable under the circumstances.

The Commission applied similar reasoning to Docket No. RP74–20/83. It costed the preferred stock at zero; the return on common equity remained at the stipulated 14.00%; the cost of debt was unchanged. The overall rate of return on that docket became 7.77%.[4]

United appeals from the Commission's order, urging that the spin-off settlement requires the $100 million to be treated either as common equity and costed accordingly or

| | Amount (000's) | Ratio | Cost | Weighted Cost |
|---|---|---|---|---|
| Long-Term Debt | $224,681 | 54.96% | 8.9 % | 4.891% |
| Preferred Stock | 100,000 | 24.46% | 9.75% | 2.385% |
| Common Equity | 84,129 | 20.58% | 14.00% | 2.881% |
| | $408,810 | 100.00% | | 10.157% |

3. Judge Lande allowed the following capitalization and returns in RP75–30:

| | Amount (000's) | Ratio | Cost | Weighted Cost |
|---|---|---|---|---|
| Long-Term Debt | $212,487 | 52.41% | 7.92% | 4.15% |
| Preferred Stock | 100,000 | 24.67% | –0– | –0– |
| Common Equity | 92,910 | 22.92% | 15.00% | 3.44% |
| | $405,397 | 100.00% | | 7.59% |

4. After Opinion No. 16, the following capitalization and returns applied to RP74–20/83:

| | Amount (000's) | Ratio | Cost | Weighted Cost |
|---|---|---|---|---|
| Long-Term Debt | $224,681 | 54.96% | 8.9 % | 4.891% |
| Preferred Stock | 100,000 | 24.46% | –0– | –0– |
| Common Equity | 84,129 | 20.58% | 14.00% | 2.881% |
| | $408,810 | 100.00% | | 7.772% |

as preferred stock at a cost of 9¾%. The net effect of the Commission's rate order, it contends, is to deny the company the opportunity to earn a just and reasonable return.

## II

 A party seeking to overturn a rate order promulgated by the Commission under the Natural Gas Act undertakes "the heavy burden of making a convincing showing that it is invalid because it is unjust and unreasonable under the circumstances." *FPC v. Hope Natural Gas Co.*, 320 U.S. 591, 602, 64 S.Ct. 281, 288, 88 L.Ed. 333 (1944). Moreover, "courts are without authority to set aside any rate selected by the Commission which is within a 'zone of reasonableness.'" *In re Permian Basin Area Rate Cases*, 390 U.S. 747, 767, 88 S.Ct. 1344, 1360, 20 L.Ed.2d 312 (1968) (quoting *FPC v. Natural Gas Pipeline Co.*, 315 U.S. 575, 585, 62 S.Ct. 736, 743, 86 L.Ed. 1037 (1942)).

Nevertheless, we are not without guidelines to determine whether the Commission has acted within its authority and we will not hesitate to set aside the Commission's order when its total effect is not fair and reasonable. The Supreme Court first set out these guidelines in 1944 in *Hope Natural Gas Co.:*

> The rate-making process under the Act, i. e., the fixing of "just and reasonable" rates, involves a balancing of the investor and the consumer interests. Thus we stated in the Natural Gas Pipeline Co. case that "regulation does not insure that the business shall produce net revenues." But such considerations aside, the investor interest has a legitimate concern with the financial integrity of the company whose rates are being regulated. From the investor or company point of view it is important that there be enough reve-
nue not only for operating expenses but also for the capital costs of the business. These include service on the debt and dividends on the stock. By that standard the return to the equity owner should be commensurate with returns on investments in other enterprises having corresponding risks. That return, moreover, should be sufficient to assure confidence in the financial integrity of the enterprise, so as to maintain its credit and to attract capital.

320 U.S. at 603, 64 S.Ct. at 288 (citations omitted). We need only examine whether the Commission's rates are designed to generate sufficient revenue to cover the capital costs of the business. Coverage of United's operating expenses is not at issue here.

 The Commission set overall rates of return on capital of 7.77% and 7.59% in Docket Nos. RP74–20/83 and RP75–30, respectively. United urges that these overall rates fall below those available on comparable investments and below the level necessary to attract capital. The overall rate, however, is merely the weighted average of the separate rates allowed by the Commission on the various types of capital on the utility's balance sheet.[5] The overall rate of return is the conclusion, not the premise. The overall rate of return is reasonable if the rate of return on each of its elements is reasonable. If the return set on each element is fair and reasonable, computing the overall rate of return by finding the weighted average is simply an arithmetical procedure to ensure that the revenues generated provide the proper rate of return on each component.[6] We must therefore determine whether the Commission allowed a fair and reasonable return on each portion of United's capital.

---

5. The overall rate of return on capital is computed by multiplying the rate on each class of capital by the ratio of that class to the total capital and adding the products. For example, if Firm $X$'s capital stock comprises $200 million debt and $100 million equity, the overall rate is two-thirds the return on debt plus one-third the return on equity. If those rates are 6% and 9%, respectively, the overall rate of return is $(2/3 \times 6\%) + (1/3 \times 9\%) = 4\% + 3\% = 7\%$. *See* nn. 2–4 *supra*.

6. To use the example in note 5 *supra*, allowing a 7% return on the total $300 million of capital would provide $21 million in revenue, $12 million to pay 6% interest on $200 million debt and $9 million available for distribution to the equity holders.

### A. *Classification of Capital*

■ The first step in making such a determination is the classification of capital. As we noted in *El Paso Natural Gas Co. v. FPC*, 449 F.2d 1245, 1251 (5th Cir. 1971):

> The procedure . . . of separately determining the portions of a company's capital structure related to debt, to preferred stock, and to common equity, and separately assessing a fair and reasonable return based upon differing allowances to each of these segments, is the common and accepted practice for this phase of ratemaking. Under such a procedure the Commission must perforce determine the appropriate amounts to be included in each category.

United's capital is difficult to classify because of the spin-off settlement, which rescinded the issuance of the $100 million preferred stock and required the refund of the $15 million equity contribution to Pennzoil and the return of the preferred stock dividends to United. During the locked-in period, United's capital structure comprised $100 million in preferred stock, $92 million in common equity, and $212 million of long-term debt. After the settlement went into effect, the $100 million was restored to United's common equity accounts,[7] eliminating the preferred equity on United's balance sheet. The question for the Commission was whether for ratemaking purposes United's balance sheet during the locked-in period should be treated as it actually existed during that period or instead as it was refashioned by the spin-off settlement.

In Opinion No. 16, the Commission chose the former course and classified the $100 million as preferred capital during the locked-in period.[8] It reasoned that classification of capital is a means toward determining the risk associated with that capital. During the locked-in period, the holder of the preferred stock in fact enjoyed a senior claim on United's earnings. The preferred investment was less risky than that of the common equity holders, who were bound to recognize that prior claim. The capital was properly classified to reflect that fact. The Commission concluded:

> We find no error in the conclusion of the Presiding Judge that this $100 million of United's outstanding capital is properly classified and costed as preferred capital. The classification found appropriate by the Presiding Judge accords with the realities existent during the locked-in period involved in the instant proceeding, and it is adopted.

United asserts that to characterize the $100 million as preferred equity ignores the terms of the spin-off settlement, which provided that the preferred stock and equity contribution were to be "rescinded and restored as of [their dates of issue]." The word "rescind" was carefully chosen, United argues, for its precise legal meaning, that of restoring the funds as if the spin-off had never taken place.

We agree that "rescind" has a precise legal meaning and was chosen by the parties for a specific purpose. That purpose, however, was to undo any possible violation of section 12 of the Natural Gas Act that Pennzoil might have committed by the spin-off.[9] The mere use of the word "rescind," however, did not require the Commission, in

---

7. With the refund of the $15 million, the net increase in common capital was $85 million, which was credited to United's retained earnings account. The preferred stock was not converted to treasury stock; no new shares were authorized; no new liability offset this increase in assets. Thus, the common equity shareholders enjoyed an increase in the book value of their investment of $85 million or 91%. United's reply brief, in arguing that the equity contribution and dividends were offsetting, states that the returned dividends were credited to its capital accounts. If that is the case, the net increase was approximately $100 million or 108%.

8. All parties agree that the long-term debt and the remaining equity were properly classified. Only the $100 million is in dispute.

9. The portion of section 12 relevant to the spin-off states in pertinent part: "[I]t is unlawful for any officer or director of any natural-gas company . . . to participate in the making or paying of any dividends, other than liquidating dividends, of such natural-gas company from any funds properly included in capital account." 15 U.S.C. § 717k.

setting rates, to blink the reality that the spin-off occurred and existed during the locked-in period.

The Commission properly classified the $100 million as preferred stock during the locked-in period to accord with then-existing realities. It also properly held that the common equity included Pennzoil's $15 million contribution even though it was subsequently "rescinded" and returned, because that contribution was a part of United's common equity during the locked-in period.

The Commission stated that it classified the $100 million of preferred stock to determine the risk associated with that capital. Of equal importance, however, the classification of preferred capital determines the risk associated with the $93 million of common equity. Earnings otherwise available for distribution to common stockholders are subject to the senior claims of bondholders and preferred stockholders.

United does not quibble with the conclusion that the risk must be assessed in light of the perceptions of the investors during the locked-in period. It asserts, however, that there is no evidence of what the investors actually perceived during the locked-in period. Investors may well have been aware from an early stage, United contends, that the settlement negotiations would lead to the return of the $100 million to United's common equity accounts. If they were thus aware, the argument runs, they did not expect the preferred stock to enjoy a senior claim on earnings.[10]

The evidence introduced by United in support of this proposition consisted of an account in the *Wall Street Journal* of the settlement negotiations. To draw conclusions about investors' thought processes from this news release would be rank speculation. In basing its findings upon "the existence of the preferred stock, and upon common business perceptions regarding the relationship between preferred and common stock," the Commission acted correctly. Indeed, in the absence of evidence indicating that United's common shareholders ignored conventional investment realities, we might have been compelled to set aside a Commission decision to use a hypothetical balance sheet to determine United's rates.[11] We affirm the Commission's decision to use the capital structure as it actually existed during the locked-in period and to classify the $100 million as preferred equity.

### B. Cost of Each Class of Capital

■ Each class of capital should be costed separately. *Hope Natural Gas* requires that the allowed rate generate sufficient revenue for the capital costs of the business. The rate of return on each class must therefore be sufficient for the utility to recover its cost on that class. The proper procedure for "costing" capital depends on the kind of capital involved.

■ 1. *Common Equity.* The Supreme Court has set out guidelines for the proper costing of equity capital:

> [T]he return to the equity owner should be commensurate with returns on other enterprises having corresponding risks. That return, moreover, should be sufficient to assure confidence in the financial integrity of the enterprise, so as to maintain its credit and to attract capital.

*FPC v. Hope Natural Gas Co.*, 320 U.S. at 603, 64 S.Ct. at 288. It is true that these guidelines—called the "comparable earnings" standard and the "capital attractive-

---

10. This argument is undercut by United's assertion, elsewhere in its brief, that no rational investor would have expected that the Commission would require United to return the $15 million equity contribution without receiving the refund of its preferred stock dividends, *i. e.*, these hypothetical investors would have expected United to have to pay $15 million to get back its approximately $15 million in dividends. If these hypothetical investors believed as United urges, they would then have per-

ceived a senior claim on United's earnings—either to pay the dividends or to refund the supposed offset. If they did, the risk they expected to undertake was no less than that of an investor who knew nothing about the settlement.

11. We do not address the Commission's contention that in appropriate cases it may use a hypothetical capital structure to determine rates.

ness" standard—are neither exhaustive nor exclusive. Indeed, the Commission may set fair and reasonable rates without reference to these standards. *See El Paso Natural Gas Co. v. FPC,* 449 F.2d 1245, 1251–52 (5th Cir. 1971). But if both these standards are satisfied, it is unlikely that the resulting rate would not be fair and reasonable.

██ The first step in determining the cost of common capital is to weigh the riskiness of the investment. In making this assessment, the Commission correctly viewed the situation as it appeared to an investor during the time he held his investment. The evaluation of risk, after all, entails the prediction of future outcomes then unknown. As the Commission noted, the spin-off settlement's effectiveness "did not and could not affect investment decisions during the effective period of the instant rates."

The Commission correctly looked to United's financial structure. United's shareholders could not expect Pennzoil to satisfy their investment expectations; United's common equity had to be evaluated on the strength of United alone. The common equity holders knew that United would have to pay interest to the bondholders and a stated dividend to the preferred shareholders before any of the earnings would be available for distribution to them. United's "thin" equity ratio [12] meant that common equity investment in United was riskier

than in other firms whose earnings were used for comparative purposes. [13]

The Commission then weighed business factors. United had a difficult supply outlook. Adverse economic conditions prevailed during the locked-in period. The spin-off arrangements themselves made the risk appear greater because United's shareholders could no longer look to Pennzoil. The fact that the Commission was investigating the spin-off heightened the risk perceived by investors during the locked-in period. The Commission properly recognized that all these factors argued for a higher return than would be realized on alternative investment earnings. The evidence of alternative investments against which United had to compete tended to show a reasonable and fair range of equity earnings from 14.00% to something in excess of 15.00%. The Commission concluded that, based on a common equity ratio of 22.92% and all the above factors, a rate of return on common equity of 15.00% was justified. [14]

Viewing the circumstances as they actually existed during the locked-in period, with an awareness that a reasonable rate of return is characterized by an area, not a point, *see Montana-Dakota Utilities Co. v. Northwestern Public Service Co.,* 341 U.S. 246, 251, 71 S.Ct. 692, 695, 95 L.Ed. 912 (1951), the return allowed to the investors on common equity is fair and reasonable.

---

**12.** United's common equity ratio was only 22.92% during the period covered by RP75–30; only $92,910,000 of United's total capitalization of $405,397,000 was common equity. In RP74–20/83, $84,129,000 of $224,681,000, or 20.58%, was common equity. These figures include Pennzoil's $15 million capital contribution even though subsequently refunded, for it was in fact reflected on United's balance sheet during this locked-in period and investors consequently expected to earn a return on this portion of their equity as well. Moreover, the common equity ratios included the $15 million; without it, they would have been still lower.

**13.** When a corporation's capital is highly leveraged, as United's is here—that is, the ratio of debt and preferred obligation to common equity is high—the return on common equity becomes increasingly volatile, as small percentage changes in revenues become large percent-

age changes in earnings available for distribution to common shareholders.

**14.** In RP74–20/83, the Commission allowed a return of 14.00% on common equity. This figure had been arrived at by settlement in December 1975 and approved by the Commission in Opinion No. 815. In Opinion No. 815–A, the Commission reopened the settlement to consider the effect of the Spin-off Settlement. After due consideration, the Commission maintained the settlement return of 14.00% on common equity, reasoning, as it did in RP75–30, that the Spin-off Settlement could not have affected investors' perceptions of risk during the locked-in period. That the allowed rate is 14.00% rather than 15.00% is of no consequence: the common equity ratio was different from that in the subsequent proceeding; business conditions may have been different; and the rate was agreed upon by settlement.

2. *Preferred Stock.* Costing preferred stock, like debt, is usually a straightforward matter. Preferred stock bears a stated dividend, an amount that the company is obliged to declare to holders of the preferred issue before it makes any distribution to the common stockholders. When the stock is "cumulative," as it is here, if the company should ever fail to pay the stated dividend, common shareholders may receive no dividend until all missed dividends on the preferred stock are made up. The cost to the utility, then, is the "embedded" or actual historical cost, which is ordinarily the stated dividend. As one noted authority has observed:

> The determination of the cost of preferred stock is carried out in much the same manner as for debt. Commissions look upon the percentage dividend as being almost as much a contractual obligation as interest on bonds. The actual historical cost of preferred stock is computed by taking the fixed dividend rate and adjusting for costs of flotation and any other unamortized expenses.[15]

It is not necessary to engage in the rough and approximate techniques used for common equity of examining alternative investments and subjectively assessing the riskiness of the enterprise.

The normal costing procedure must be adapted to the peculiar circumstances of this case. The Commission applied a technique it had used in other unusual rate proceedings:

> When computing the embedded costs of debt and preferred stock it is appropriate that the cost allowed is net of gains and losses or expenses that are associated with the particular securities.

For these rate proceedings, the net cost of the preferred stock to United was zero because Pennzoil returned all dividends to United.

United's principal objection to costing the preferred stock at zero[16] is that the Commission thereby "erroneously refashions the Spin-Off Settlement." This argument runs as follows: The Commission construed the return of dividends out of context, ignoring the remaining terms of the agreement. United received no windfall, because the return of the dividends was almost exactly offset by United's return to Pennzoil of the original contribution to United's equity. The net effect of those two payments was "a virtual wash," so the $100 million did indeed have a net cost to United during the locked-in period.

This argument is unpersuasive. As the Commission noted, there were several transactions involved in the spin-off. The equity contribution was an integral part of the consideration for making the entire spin-off, just as its refund was part of the consideration for its undoing. The return of the equity contribution was as much a part of the *quid pro quo* for the return of the preferred stock as it was for the return of the dividends.

Moreover, it was merely fortuitous that the dividends and the equity contribution were nearly equivalent in amount. The spin-off settlement did not specify the amount of the dividends to be returned to United, because the drafters were uncertain when the settlement would become final. United, however, was to continue paying dividends until it did become final, and it was the clear intention of the settlement that *all* preferred dividends paid be returned to United. Had the settlement become final but three days later—on January 1 instead of December 28—the amount of dividends to be returned would have increased to $17,577,083, and United's argument would become untenable.

United's second argument against assigning a zero cost to the preferred stock is that it denies United the opportunity to earn

---

**15.** P. Garfield & W. Lovejoy, Public Utility Economics 124 (1964).

**16.** United's first argument was that the $100 million should have been classified as common

equity. We have already explained why that contention is untenable. United makes these additional objections assuming that we affirm the Commission's classification.

any return on $100 million of its capital; [17] *i. e.*, it is not fair and reasonable to allow zero return on the $100 million, regardless of the effect of the spin-off settlement. The $100 million represents claims against assets that are dedicated to public service, United contends, investments on which it is entitled to earn a return. United urges that the mere ownership of assets entitles it to receive a return on those assets; even though the allowed return may vary, it cannot fairly be zero if those assets were engaged in a productive capacity during the period in which a return is sought.

This argument too is unavailing. A corporation does not earn money for its "own" benefit, but to repay its creditors and then for the benefit of its owners, the shareholders. Those who held United's common equity during the locked-in period have been justly compensated by United's earnings during that prior by the Commission's allowances of 14% and 15% return on common equity. The one who will earn no return on the investment of $100 million is the sole holder of that preferred equity, Pennzoil. That result, however, does not flow from any of the rate proceedings; rather, it is the result of the spin-off settlement. If it is a harsh result for Pennzoil to have been deprived of any return on $100 million during the locked-in period, it is a result Pennzoil contracted for in the spin-off settlement and one of which it does not now complain.

For a regulated utility such as United, productive assets do not churn out a product at a rate of return set by an unseen hand. In an unregulated industry in a free-market economy, Adam Smith's "invisible hand" may set such a rate, one that takes no revealed knowledge to discern. The market sets the price of the firm's output, and the rate of return to its owners is dictated by its productive processes and the market mechanism. But government regulates certain industries precisely because it does not want market forces to set those rates, usually because the industry is monopolistic or oligopolistic. Instead, an agency sets those rates to balance the interest of consumers and investors. The kilowatt-hours, or message-units, or thousand cubic feet produced by a utility have no intrinsic dollar value in a regulated industry.

We need not decide here what disposition of this case would be appropriate had Pennzoil retained the common stock as well as the preferred stock. The United common stock holders had no expectancy of return on the $100 million represented by the preferred stock. This $100 million worth of assets reflected in the preferred stock was removed from the assets reflected in the book value of the common stock. Pennzoil having itself given up that return, the cost-free use of the $100 million worth of assets was an unexpected benefit unassociated with risk or expectancy of benefit. Therefore, when a utility enjoys an unexpected benefit that is not associated with the risk sought to be undertaken by the investors, the regulating authority may properly determine that such benefit should accrue to the consumers rather than to the investors. For example, if a munificent investor were to put up all the capital for a utility free of charge, the Commission could properly set the rates to reflect costs of production only. In the case before us, it was within the informed discretion of the Commission, recognizing that the cost of $100 million in capital had been borne by Pennzoil and not by United, to order that the rates be set so that the consumers gain

---

**17.** Besides the arguments we address here, United urges in support of this contention two propositions that we have already decided adversely to it. First, it argues that because the preferred stock derived from its common equity accounts, the $100 million should have been treated as common equity. We have approved the Commission's classification of $100 million as preferred to accord with reality. Second, it contends that the overall rates of return that result from costing the preferred at zero— 7.77% for RP74–20/83 and 7.59% for RP75–30 —are not fair and reasonable because they are lower than those available in equally risky enterprises and too low to attract capital. The overall rate of return is only a weighted average. It is fair and reasonable if, and only if, the rate of return for each of its components is fair and reasonable. *See* n.5 *supra*.

the benefit of United's low-cost capital, rather than letting United charge as much as would have been appropriate had that capital been acquired by United in the market and paid for at the market's rate.

United also contends that the fair rate of return on capital—including preferred capital—is not determined by the amount the company pays in dividends on that capital. United analogizes to common equity: "No one disputes that a regulated company's dividend policy on its common stock should not affect the rate of return allowed on that portion of its capitalization." Such an analogy is inapposite. Common and preferred stock are very different investments, costed according to different principles.

The rate of return allowed on common equity must be sufficient to reward the investors' risk and to attract capital. The reward on common cannot be equated solely to the dividend the investors receive, for companies frequently elect not to distribute all or even any of their earnings. Instead they may choose, for example, to retain them in order to further business needs or to finance new asset acquisition. In so doing, however, the book value per share of common stock increases, and, in any normal market, the price of the common stock should increase. Thus, an investor in common equity normally expects to derive his reward from both dividends and capital appreciation.

■ Preferred stockholders, in contrast, receive their reward almost exclusively from the stated dividend.[18] Thus the argument that a company's dividend policy on common stock may not affect the rate of return allowed thereon is not persuasive with respect to preferred equity. On the facts of this case, it was appropriate to cost the preferred stock by means of its net embedded cost to United. We therefore reject United's argument that it is entitled to some rate of return for its $100 million of preferred stock, regardless of its cost to United.

It was suggested at oral argument, however, that it was fatally inconsistent for the Commission to classify the $100 million as preferred and the $15 million capital contribution as common "to accord with the realities of the locked-in period," while at the same time looking to post-period transactions, namely the return of the dividends, to determine the cost to United of that $100 million. We find nothing in the Commission's treatment that is not fully warranted by the differences between common and preferred equity and the need to determine their rates of return differently.

Because the return on common equity is designed to compensate the investor for the risk he perceives to undertake, it must be determined by looking at the situation as it appeared to a typical investor, viewing the situation prospectively as it in fact existed. Therefore, capital must be classified as it then appeared on the balance sheet. The cost of common equity is determined in part by reference to that classification.

Preferred stock does not require such an exclusively prospective look, however, because it is costed on a payout basis, not on a risk-rewarding basis. Here, that rate was set first at 9.75% by Pennzoil's holding it at the stated dividend and subsequently at zero by the agreement reached in the spin-off settlement.

The question then becomes, what is the appropriate measure of the embedded cost of preferred when, as here, events at the end of a period affect the actual cost paid by the utility? To compute the embedded cost of debt or preferred stock, the Commission has adopted the practice of allowing the cost net of gains and losses or expenses

---

18. While the market price of a share of preferred stock does fluctuate, the price responds primarily to changes in the prevailing interest rate, much like the price of a bond. Continued retention of earnings could make the company appear more sound financially. However, increasing the retained earnings does not usually increase the book value of preferred stock, as it does for common stock, because preferred shareholders typically have a priority claim against a fixed amount of assets. If the company had a poor financial history, such a bolster could enhance the market price of a share of preferred. In the case of a solvent company such as United, this effect is de minimis, however, compared to the interest rate effect.

realized in connection with the security. For example, savings realized when a utility repurchases its debt are held to reduce the embedded cost of that debt to the utility, and the allowed rate of return thereon is reduced accordingly. That treatment reflects a Commission determination that "all savings arising from the repurchase of debt at a discount should be passed on to the consumer." *Kansas-Nebraska Natural Gas Co.*, 53 F.P.C. 1691, 1708–09 (1975). *See also Manufacturers Light and Heat Co.*, 44 F.P.C. 314 (1970).

The purpose of computing the embedded cost of preferred equity is to determine its actual historical cost. Thus, computing the embedded cost as the Commission has done here is an appropriate method. To ignore gains and losses realized thereon simply because they were not foreseeable at the beginning of the period would avoid reality for no good reason. It cannot be gainsaid that this method is the most accurate way of calculating the capital's cost to the utility. Moreover, the Commission has amply demonstrated, as we have described above, that it does not produce unfair or unjust results. The difference in treatment of common and preferred stock does not demonstrate an inconsistency. Rather, it is the result of consistent application of sound ratemaking principles.

### III

It is unusual for the Commission to allow zero return on $100 million of a utility's capital. However, the spin-off settlement created an extraordinary situation. For reasons it deemed proper, Pennzoil, the preferred shareholder, agreed to return all dividends paid on its $100 million of preferred stock during a twenty-one month period. Capital is never cost-free in the absolute, but in this case it was cost-free to United, for Pennzoil bore its entire cost. The rates set by the Commission properly reflected this unusual circumstance. United will earn sufficient revenues, after operating expenses, to pay the interest on its debt and offer a suitable reward to its common equity holders. The Commission properly discharged its responsibility in allocating this singular benefit to the ratepayers.

AFFIRMED.