**LOUISIANA PUBLIC SERVICE COMMISSION, Petitioner,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent.**

No. 81–4470.

United States Court of Appeals, Fifth Circuit.

Oct. 4, 1982.

---

358

Michael R. Fontham, Paul L. Zimmering, New Orleans, La., Marshall B. Brinkley, Gen. Counsel, Louisiana Public Service Com'n, Baton Rouge, La., for petitioner.

Norma Rosner, F. E. R. C., Washington, D. C., for respondent.

Richard M. Merriman, Robert S. Waters, Washington, D. C., for Middle South Services, Inc.

Before CLARK, GARZA, and JOHNSON, Circuit Judges.

JOHNSON, Circuit Judge:

Petitioner, the Louisiana Public Service Commission (Louisiana Commission), seeks review of a decision of the respondent, the Federal Energy Regulatory Commission (FERC), involving the rates set by FERC for interstate sales of power among four affiliated electric utilities. The four affiliated electric utilities, collectively known as the Middle South Utilities System (MSU), sought expansion of the categories of expenses subject to a previously approved automatic adjustment formula and an increase in the rate of return allowed under the MSU system agreement (Agreement). The order of FERC, which affirmed in part and modified in part the decision of the administrative law judge, expanded the categories of expenses subject to the automatic adjustment formula and increased the rate of return allowed under the Agreement. Having concluded that FERC's decision is supported by substantial evidence and results in a just and reasonable rate that does not unduly discriminate against ratepayers, this Court affirms.

I. *The Middle South Utilities System and Its Operation*:

MSU is composed of Middle South Utilities, Inc., a public utility holding company, Middle South Services, Inc. its subsidiary-agent for regulatory matters, and four electric utility subsidiaries: Louisiana Power and Light Co., Arkansas Power and Light Co., Mississippi Power and Light Co. and New Orleans Public Service, Inc. The Agreement, approved as the operating tariff by FERC in 1973, composes the contractual framework for the interchange of power among the four affiliated electric utilities. 49 FPC 1472 (June 29, 1973). Section 3.01 of the Agreement provides that the purposes of the Agreement are:

... to provide the contractual basis for the continued planning, construction, and operation of the electric generation, transmission and other facilities ... and to provide a basis for equalizing among the Companies any imbalance of costs associated with the construction, ownership and operation of such facilities as are used for the mutual benefit of all the Companies.

Charges under the Agreement are made under five separate service schedules: (1) capability equalization, (2) transmission equalization, (3) exchange of electric energy, (4) distribution of revenue from sales made for the joint account of all the companies, and (5) distribution of operating expenses of the system operations center. The issues in this appeal revolve around capability and transmission equalization service schedules.

The Agreement requires each of the affiliated utility companies to maintain the generating capacity and other facilities necessary to supply its own local requirements. However, in order to achieve economies of scale through the construction of large units, an individual utility may be required to construct, own, and operate a new generating unit of sufficient size to help provide the power necessary to obtain the operating requirements of the entire MSU system. A utility that has a generating capacity less than its respective responsibility (a "short" or "buying" company) is required to pay a capability equalization charge to utilities generating, or capable of generating, power in excess of their respective responsibilities ("long" or "selling" companies).

Although the service schedules at issue in this proceeding govern the amounts paid and received among operating companies as a result of system-wide transactions, the same payments and receipts are accounted for in wholesale and retail regulatory proceedings in the respective states of each utility. In other words, the amounts received by a "selling" company may be utilized as income in determining the rates that ratepayers in the "selling" company's territory must pay in order to achieve the

rate of return permitted in that particular territory. Likewise, payments made by a "buying" company may be considered expenses in determining the rates that ratepayers in the "buying" company's territory must pay in order to achieve the rate of return permitted in that particular territory. Consequently, the amounts charged ratepayers of different territories are dependent upon the status of the utility operating in each territory.

Under the previously approved operating tariff, operation and maintenance costs, general administrative over-heads attributable to the production function, return on common equity, and the structure ratios were fixed, but, the other components were adjusted automatically as their values increased or decreased. MSU, through its subsidiary-agent, Middle South Services, Inc., sought to place operation, maintenance, and general and administrative expenses under the automatic adjustment formula, thereby making all costs, except cost of equity, subject to the automatic adjustment formula. FERC granted MSU the requested changes in the automatic adjustment formula, and, furthermore, increased the rate of return on common equity to 14%. Louisiana Commission has perfected this appeal complaining of FERC's decision as to the appropriate expenses subject to the automatic adjustment formula and the proper return on common equity.

## II. *The Standard of Review*:

A litigant seeking to overturn a rate decision of FERC must make a "convincing showing that it is invalid because it is unjust and unreasonable under the circumstances." *FPC v. Hope Natural Gas Company*, 320 U.S. 591, 64 S.Ct. 281, 288, 88 L.Ed. 333 (1944); *United Gas Pipe Line v. FERC*, 618 F.2d 1127, 1131 (5th Cir. 1980). In reviewing a decision by FERC, this Court is "without authority to set aside any rate selected by the Commission which is within a 'zone of reasonableness'". *In re Permian Basin Area Rate Cases*, 390 U.S. 747, 88 S.Ct. 1344, 1360, 20 L.Ed.2d 312 (1968) (quoting *FPC v. Natural Gas Pipeline*

*Company*, 315 U.S. 575, 62 S.Ct. 736, 743, 86 L.Ed. 1037 (1942)). Additionally, FERC is not "bound to a single rate making method or formula, but is free to make pragmatic adjustments in it's methods." *Arkansas, Louisiana Gas Co. v. FERC*, 654 F.2d 435 (5th Cir. 1981). Moreover, in reviewing the facts relied upon by FERC in reaching its decision, this Court must only decide whether the facts relied upon by FERC are supported by substantial evidence. 16 U.S.C. § 825*l*(b) (1976); *In re Permian Basin Area Rate Cases*, 88 S.Ct. at 1372.

III. *Automatic Adjustment Clauses*:

▪ 16 U.S.C. § 824d(a) requires FERC to review public electric utility rates for reasonableness. However, § 824d(f) authorizes the use of an automatic adjustment clause in the computation of utility rates when the use of such a clause would result in the "efficient use of resources" and the "economical purchase and use of fuel, electric energy, and other items." 16 U.S.C. § 824d(f) (1976). Additionally, FERC is required to review periodically the use of such clauses for efficiency and to determine:

> whether any such clause reflects any costs other than costs which are—
> (i) subject to periodic fluctuations and
> (ii) not susceptible to precise determinations in rate cases prior to the time such costs are incurred.

16 U.S.C. § 824d(f)(1)(B). Although the statute specifies criteria to be used by FERC in reviewing the use of automatic adjustment clauses, the statute does not state that the use of such clauses is restricted to unstable, unpredictable expenses. In fact, in 1978 Congress specifically recognized FERC's practice of authorizing an automatic adjustment formula to operate as a rate. Under § 208 of the Public Utility Regulatory Policies Act of 1978 (PURPA), FERC is required to review the use of automatic adjustment clauses. Public Utility Regulatory Policies Act of 1978, Pub.L. No. 95–617, 92 Stat. 3117 *et seq.* (1978). Significantly, however, the Conference Report accompanying PURPA states that "the conferees do not indicate any preference for inclusion or exclusion of any item in an automatic adjustment clause." H.R.Rep. No. 95–1750, 95th Cong. 2d Sess. 96 (1978) U.S.Code Cong. & Admin.News 1978, pp. 7659, 7830. Therefore, this Court, recognizing that FERC's order is "the product of expert judgment which carries a presumption of validity....," holds that FERC's decision to utilize the automatic adjustment clause in the instant case is not invalid. *FPC v. Hope Natural Gas Co.*, 320 U.S. 591, 64 S.Ct. 281, 288, 88 L.Ed. 333 (1944); *United Gas Pipe Line v. FERC*, 618 F.2d 1127 (5th Cir. 1980), cert. denied, 450 U.S. 911, 101 S.Ct. 1349, 67 L.Ed.2d 335 (1981). However, our inquiry does not end here.

▪ 16 U.S.C. § 824d provides that:

> Unless the Commission otherwise orders, no change shall be made by any public utility in any such rate, except after sixty days notice to the Commission and to the public. The Commission, for good cause shown, may allow changes to take effect without requiring the sixty days' notice herein provided for by any order specifying the changes so to be made and the time when they shall take effect and the manner in which they shall be filed and published.

16 U.S.C. § 824d (Supp.1982). Louisiana Commission contends that FERC erred in finding good cause to extend the scope of expenses computed under the automatic adjustment clauses. In response, FERC maintains that its decision to extend the scope of expenses allowed under an automatic adjustment clause is supported by the decision in *Central Power and Light Co.*, 11 FERC ¶ 61,101 (1980), wherein FERC noted its decision to allow the use of automatic adjustment clauses, without conditions, in full cost of service tariffs for unit sales and sales to affiliates. This Court affirms FERC's decision that good cause has been demonstrated to support an exception to the general notice requirement of § 824d. 16 U.S.C. § 824d (Supp.1982).

As FERC noted in its decision, the use of automatic adjustment clauses in the instant proceeding is "particularly appropriate because the proposed formula provide[s] for

upward and downward adjustments ... and because the sales involved are among affiliates operating on a pool basis." *Middle South Services, Inc.*, FERC Opinion No. 124 at 5. Moreover, as FERC contends, under the automatic adjustment clause formula, ratepayers can be assured that they will be required to pay only for actual increases and decreases in cost. This is true because the automatic adjustment formula itself, rather than an estimated unit charge, constitutes the rate. It should be noted that the accuracy of the costs included under the formula could be verified by FERC audit, or by an investigation instituted under § 206 of the FPA. Therefore, this Court concludes that FERC's decision that good cause exists to allow deviation from the general notice provisions of § 824d is supported by substantial evidence. *See* 16 U.S.C. § 825*l*(b) (1976); and *In re Permian Basin Area Rate Cases*, 88 S.Ct. at 1372.

## IV. *Rate of Return:*

■ Louisiana Commission argues that FERC's decision to set the rate of return on common equity at 14 percent is erroneous. It maintains that FERC erred in utilizing the traditional cost of analysis in arriving at the appropriate rate of return due to the unique nature of the interaffiliate transactions that take place under the Agreement. *See FPC v. Hope Natural Gas Co.*, 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944); *Bluefield Water Works and Improvement Co. v. Public Service Commission*, 262 U.S. 679, 43 S.Ct. 675, 67 L.Ed. 1176 (1923). This Court holds that the result reached by utilization of FERC's method of arriving at the proper rate of return is not unjust and unreasonable, and, therefore, affirms FERC's decision to set the rate of return for MSU at 14%.

In reviewing a rate of return set for a utility by FERC, this Court must determine whether the rate set is "just and reasonable." 16 U.S.C. § 824d(b). At the same time, § 824d(b) prohibits a utility from granting any "undue preference or advantage to any person," subjecting anyone to "an undue prejudice or disadvantage," or

maintaining any "unreasonable difference in rates [or] charges ... between classes of service." 16 U.S.C. 824d(b). However, it should be noted that it is the *result* of the rate that must comply with these statutory requirements, not the *method* employed in arriving at the contested rate. *Los Angeles Gas & Electric Corp. v. Railroad Commission*, 289 U.S. 287, 53 S.Ct. 637, 643, 647, 77 L.Ed. 1180 (1933); *West Ohio Gas Company v. Public Utility Commission*, 294 U.S. 63, 55 S.Ct. 316, 320, 79 L.Ed. 761 (1935); and *Arkansas, Louisiana Gas Co. v. FERC*, 654 F.2d at 437.

Louisiana Commission argues strenuously that the discriminatory impact upon ratepayers caused by FERC's method of establishing the rate of return demonstrates the unreasonableness and unjustness of the rate of return set for MSU. Commendably, MSU's system seeks to operate its interaffiliated affairs in a manner that will save money for ratepayers of the operating companies by maximizing efficiency and reducing costs. Admittedly, the system results in rate differences in the various jurisdictions occasioned by the natural operation of multiple regulatory systems. For example, the ratepayers in a "buying" company's territory may be required to pay higher rates so that the "buying" company can achieve the maximum return of common equity allowed by FERC. However, as FERC noted in its decision, "in theory the 'short' companies will become 'long' and vice versa over time so that, in the long run, any discriminatory effects will cancel each other out and the result will be economies of scale which ultimately benefit all customers of the five subsidiaries." *Middle South Services, Inc.*, FERC Opinion No. 124 at 9–10. Moreover, FERC concluded that Louisiana Commission's weighted average theory would not necessarily eliminate or minimize discrimination. FERC noted that "[t]o eliminate discrimination would require not only that the rates of return for all companies be the same, but that identical regulatory treatment be accorded the companies as to all other rate elements." *Middle South Services, Inc.*, FERC Opinion No. 124 at 9. In light of FERC's conclusions, which this

Court determines are supported by substantial evidence, the Court concludes that the rate of return complies with the statutory requisites.

■ Louisiana Commission also contends that FERC erred in approving the administrative law judge's decision to focus on the entire electric operations of MSU in setting the rate of return. However, investors in MSU purchase equity in the *entire* holding company, not just in the "selling" companies or "buying" companies. Once again, although rate discrepancies may exist from time to time in the various territories, in the long run "short" companies will become "long" companies and vice versa. Hence, FERC did not err in focusing on the entire electric operations of MSU in setting the rate of return. *See Cities of Aitken v. FERC*, No. 80–2375 (D.C.Cir. March 5, 1982).

Having concluded that the rate of return does not reach unreasonable and unjust results, does not unduly discriminate against ratepayers, and is supported by substantial evidence, this Court affirms FERC's approval of a 14% rate of return.

## V. *Conclusion:*

In summary, this Court holds that FERC did not err in approving the extension of expenses allowed under the automatic adjustment clause utilized by the Middle South Utility System. Also, this Court concludes that FERC did not err in approving a 14% rate of return on common equity. Therefore, the decision of FERC is affirmed.

AFFIRMED.