**ARKANSAS LOUISIANA GAS COMPANY, Petitioner,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent.**

No. 80–3219.

United States Court of Appeals, Fifth Circuit.

Aug. 28, 1981.

Sherman S. Poland, Jacob Goldberg, G. William Stafford, Washington, D. C., Robert Roberts, Jr., Shreveport, La., for petitioner.

Jerome Nelson, Sol., Barbara J. Weller, Federal Energy Regulatory Comm., Washington, D. C., for respondent.

Before HENDERSON, ANDERSON and SAM D. JOHNSON, Circuit Judges.

R. LANIER ANDERSON, III, Circuit Judge:

The only issue raised in this petition by Arkansas Louisiana Gas Company ("ARK-LA") to review orders of the Federal Energy Regulatory Commission ("Commission") arising from rate increase filings is whether the Commission properly determined the rate of return on common equity. Because we conclude that the Commission has failed to adequately explain its determination of the lower limit of the zone of reasonableness, we vacate and remand for further action.

## I.

ARKLA is essentially a regional retail distributor of natural gas, serving end-users in Arkansas, Louisiana, Texas, Oklahoma and Kansas. It engages in all phases of the natural gas business: production, gathering, storage, transmission, and sales. Most of ARKLA's business is not subject to Commission jurisdiction. The portion of ARKLA's business that is subject to Commission jurisdiction is one sale for resale to another pipeline, Cities Service Gas Company, and sales for resale to five communities which distribute the gas to ultimate consumers. The revenues from these jurisdictional sales comprise about 6% of ARKLA's total revenues, and the volume comprises about 7.5% of ARKLA's total sales volume.

In April, 1977, ARKLA filed two applications with the Federal Power Commission [1] seeking rate increases for its jurisdictional sales.[2] Pursuant to § 4(e) of the Natural Gas Act, 15 U.S.C.A. § 717c(e) (West 1976), the Commission suspended the operation of the rate increase filings for the maximum five months and consolidated both filings for the purposes of hearing and decision.

The Commission, thereafter, approved two settlement agreements resolving all but three issues in the consolidated proceeding.[3] The only issue of these three remaining for our determination in this petition is the Commission's determination of the rate of return of ARKLA's common equity.

At the hearing, ARKLA presented evidence supporting as a minimum a claimed rate of return on common equity of 15.32%. The Commission's staff rebutted with evidence indicating a proper rate of return on equity of 11.5%. The Administrative Law Judge ("ALJ") rejected the recommendations made both by ARKLA's expert witness and the Commission's staff witness. Instead, the ALJ concluded that the zone of reasonableness based on the record ranged from 12.0% to 13.5%. The substantive question before us is whether this zone of reasonableness has been properly determined. The ALJ then concluded that a rate of return of 12.75%, the midpoint of the zone of reasonableness, was proper by balancing ARKLA's financial health with its need to attract capital for exploration and development of new gas reserves.

The Commission similarly rejected the analyses and conclusions proffered by ARKLA and the staff.[4] Although the Commission noted it had unspecified difficulties with the ALJ's reasoning in establishing the zone of reasonableness, it adopted the reasoning of the ALJ in concluding that the zone of reasonableness ranged from 12% to 13.5%. The Commission, however, reduced the allowed rate of return to ARKLA to 12.5% because it concluded that ARKLA had failed to show additional capital for exploration and development of new gas reserves was reasonable or necessary.

In accordance with § 19(a) of the Natural Gas Act, 15 U.S.C.A. § 717r(a) (West 1976), ARKLA filed a timely application for a rehearing, which was denied by operation of law. ARKLA then filed a timely petition for review in this court.

## II.

A petitioner to this court who would overturn a rate order by the Commis-

---

1. Pursuant to provisions of the Department of Energy Organization Act, Pub.L. 95–91, 42 U.S.C.A. §§ 7101, *et seq.* (West Supp.1981), and Executive Order No. 12009, 42 F.R. 46267 (Sept. 13, 1977), the Federal Power Commission ceased to exist on September 30, 1977, and most of its functions and regulatory responsibilities, together with pending proceedings were transferred to the Federal Energy Regulatory Commission, which was activated October 1, 1977. In our opinion, we will use the word "Commission" to refer both to the Federal Power Commission and to the Federal Energy Regulatory Commission.

2. Docket No. RP77–54, filed April 15, 1977, was the application with respect to the sale to Cities Service Gas Company. Docket No. RP77–55, filed April 19, 1977, was the application for the sales to the five small communities.

3. The three issues unresolved were (1) the rate of return on ARKLA's common equity, (2) gain on reacquired debt, and (3) minimum bank balances.

4. Opinion No. 71 (issued January 11, 1980).

sion has a heavy burden. The Supreme Court has stated:

> [The Commission's rate order] is the product of expert judgment which carries a presumption of validity. And he who would upset the rate order under the Act carries the heavy burden of making a convincing showing that it is invalid because it is unjust and unreasonable in its consequences.

*FPC v. Hope Natural Gas Co.*, 320 U.S. 591, 602, 64 S.Ct. 281, 288, 88 L.Ed. 333 (1944); *United Gas Pipe Line v. FERC*, 618 F.2d 1127 (5th Cir. 1980), *cert. denied*, 450 U.S. 911, 101 S.Ct. 1349, 67 L.Ed.2d 335 (1981). Moreover, "courts are without authority to set aside any rate selected by the Commission which is within a 'zone of reasonableness.'" *In re Permian Basin Area Rate Cases*, 390 U.S. 747, 767, 88 S.Ct. 1344, 1360, 20 L.Ed.2d 312 (1968) (quoting *FPC v. Natural Gas Pipeline Co.*, 315 U.S. 575, 585, 62 S.Ct. 736, 742, 86 L.Ed. 1037 (1942)); *United Gas Pipe Line v. FERC, supra.*

To insure that rates are neither unjust, unreasonable, nor confiscatory, regulatory agencies and courts frequently apply the comparable earnings test and attraction of capital test. *Bluefield Water Works & Improvement Co. v. Public Service Commission*, 262 U.S. 679, 43 S.Ct. 675, 67 L.Ed. 1176 (1923), articulated the comparable earnings test in this language:

> A public utility is entitled to such rates as will permit it to earn a return on the value of the property which it employs for the convenience of the public equal to that generally being made at the same time and in the same general part of the country on investments in other business undertakings which are attended by corresponding risks and uncertainties . . . .

262 U.S. at 692, 43 S.Ct. at 679. *Bluefield* also articulated the attraction of capital test as follows:

> The return should be reasonably sufficient to assure confidence in the financial soundness of the utility, and should be adequate, under efficient and economical management, to maintain and support its credit and enable it to raise the money necessary for the proper discharge of its public duties.

262 U.S. at 693, 43 S.Ct. at 679. *FPC v. Hope Natural Gas Co., supra*, also articulated the comparable earnings test and the attraction of capital test as follows:

> [T]he return to the equity owner should be commensurate with returns on investments in other enterprises having corresponding risks. That return, moreover, should be sufficient to assure confidence in the financial integrity of the enterprise, so as to maintain its credit and to attract capital.

320 U.S. at 603, 64 S.Ct. at 288.

■ The Supreme Court, though, has been careful to warn that the comparable earnings test and the attraction of capital test should not be narrowly identified with any particular method of proof.

Under the statutory standard of "just and reasonable" it is the result reached not the method employed which is controlling. *Cf. Los Angeles Gas & E. Corp. v. Railroad Commission*, 289 U.S. 287, 304, 305, 314, [53 S.Ct. 637, 643, 644, 647], 77 L.Ed. 1180, 1191, 1192, 1197; *West Ohio Gas Co. v. Public Utilities Commission*, 294 U.S. 63, 70 [55 S.Ct. 316, 320], 79 L.Ed. 761, 768; *West v. Chesapeake & P. Teleph. Co.*, 295 U.S. 662, 692, 693 [55 S.Ct. 894, 906, 907], 79 L.Ed. 1640, 1657, 1658 (dissenting opinion). It is not theory but the impact of the rate order which counts. If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry under the [Natural Gas] Act is at an end. The fact that the method employed to reach that result may contain infirmities is not then important.

*FPC v. Hope Natural Gas Co.*, 320 U.S. at 602, 64 S.Ct. at 287, 288.[5] The Commission

---

5. *See also Permian Basin Area Rate Cases*, 390 U.S. at 791–792, 88 S.Ct. at 1372–1373:

> It follows that the responsibilities of a reviewing court are essentially three. First, it must determine whether the Commission's order, viewed in light of the relevant facts and of the Commission's broad regulatory duties, abused or exceeded its authority.

is not bound to a single ratemaking method or formula, but is free to make pragmatic adjustments in its methods. *Shell Oil Co. v. FPC,* 491 F.2d 82 (5th Cir. 1974). Our proper focus then is to determine whether the end result in this case is unjust and unreasonable under the Act.

## III.

Before reaching the crux of the controversy, there are two sub-issues which must be disposed of.

A. *Comparison to Integrated Companies Although Only Jurisdictional Sales at Issue*

■ The first sub-issue is whether the Commission properly rejected ARKLA's analysis comparing the rate of return on equity actually earned over an eight-year period by sixteen companies. Like ARKLA, most of these companies are integrated companies, engaged in distribution, storage, transmission, production, and exploration of natural gas. ARKLA's evidence compared these companies with respect to type of ownership, bond rating, type of natural gas business (whether it be distribution, storage, transmission, production, and exploration), and whether the financial data were reported on a consolidated basis.

The Commission was unable to give substantial weight to ARKLA's evidence because ARKLA had selectively excluded for comparison purposes pipelines which are engaged primarily or exclusively in the gas transmission and sale for resale business.[6] The Commission did not reject the evidence

entirely out of hand. But, because the overwhelming majority of ARKLA's comparison group were, like ARKLA, integrated with retail gas distribution and gas exploration operations, the Commission concluded that the evidence resulted in a potential distortion in the assessment of risk associated with ARKLA's natural gas pipeline operations. ARKLA argues that the Commission was arbitrary in rejecting its comparisons; ARKLA argues that an investor can only purchase stock in ARKLA as an integrated company, and cannot invest solely in its pipeline operations. To ensure its ability to compete for the investment dollar, ARKLA maintains that the Commission should have made comparisons to the returns earned by integrated companies.

We find no fault with this decision by the Commission. Since the Commission has jurisdiction over only a small percentage of ARKLA's business, it reasonably could have concluded that it was desirable and proper to isolate the investment relating solely to ARKLA's jurisdictional sales. By refusing to give substantial weight to the returns earned by integrated natural gas companies, the Commission was assuring that the risk associated with activities other than transmission and distribution of natural gas would not distort its determination of the proper rate with respect to ARKLA's jurisdictional sales. Frequently, large capital expenditures and higher risks are associated with gas exploration and production than with transmission. To require the Commission to establish a rate of return on compar-

Second, the court must examine the manner in which the Commission has employed the methods of regulation which it has itself selected, and must decide whether each of the order's essential elements is supported by substantial evidence. Third, the court must determine whether the order may reasonably be expected to maintain financial integrity, attract necessary capital, and fairly compensate investors for the risks they have assumed, and yet provide appropriate protection to the relevant public interests, both existing and foreseeable. The court's responsibility is not to supplant the Commission's balance of these interests with one more nearly to its liking, but instead to assure itself that the Commission has given rea-

soned consideration to each of the pertinent factors. Judicial review of the Commission's orders will therefore function accurately and efficaciously only if the Commission indicates fully and carefully the methods by which, and the purposes for which, it has chosen to act, as well as its assessment of the consequences of its orders for the character and future development of the industry.

6. ARKLA's witness who compiled the comparison testified he had intentionally excluded companies engaging only in gas distribution and companies combining gas and electric service as unrepresentative of ARKLA. (Record excerpts, p. 75).

isons to returns earned by integrated companies as a whole might result in the customers of the regulated pipeline operations bearing an unfair portion of the dividends earned by ARKLA's shareholders. There was no evidence in the record that ARKLA's other operations would not earn sufficient amounts to ensure a performance comparable to other integrated companies.[7] Moreover, the Commission's refusal to make comparison with the rates of return earned by integrated companies is consistent with prior decisions establishing the rates of return for companies engaged solely in transmission or storage of natural gas. *Consolidated Natural Gas Supply Corp.*, Docket Nos. RP78–52, *et al.*, Opinion No. 70, issued Jan. 11, 1980, *aff'd sub nom. Consolidated Natural Gas Supply Corp. v. FERC*, 653 F.2d 129 (4th Cir., 1981); *Hampshire Gas Co.*, Docket No. RP75–97, Order, issued March 21, 1979; *National Fuel Gas Supply Corp.*, Docket Nos. RP–76–96, *et al.*, Opinion No. 58, issued Aug. 6, 1979. In each of these cases, the Commission had the task of establishing a rate of return for a subsidiary company engaged primarily in the storage or transmission and distribution of natural gas. In each case, the Commission refused to make comparisons to integrated natural gas companies which were similar to the parent company of the subsidiary for whom the rate was being established. ARKLA attempts to distinguish these cases because they involved a separate subsidiary company whose rate of return was being established, pointing out that the transmis-

sion segment of ARKLA's business is not performed by a subsidiary. Our reading of those cases indicates that the rationale for the Commission's method was a concern over disparity in risks associated with integrated companies as opposed to the risk inherent in the subsidiary whose rate was being established. Moreover, the subsidiaries were all totally owned by the parent. Thus, the investors who would be interested in the rate of return of the subsidiaries are the stockholders of the parent. These investors, like the investors of ARKLA, could invest only in the parent and could not invest solely in the pipeline or storage operations of the subsidiary.[8]

### B. Rejection of the Discounted Cash Flow Method

■ A second sub-issue is whether the Commission properly rejected ARKLA's evidence projecting the future cost of its equity capital by use of the discounted cash flow ("DCF") method. The DCF method hypothesizes that the current cost of equity capital is the sum of the current dividend yield as a percentage of the stock's market price plus the current rate of growth in the value of the stock. (Record excerpts, p. 3469).[9] The Commission rejected ARKLA's DCF presentation because (1) the period selected by ARKLA to calculate the current rate of growth had not been shown to be representative of investors' expectations of future growth and (2) no attempt had been

7. A witness for ARKLA indicated that the Arkansas Public Service Commission had established in 1972 a rate of return on common equity of 15.32%. About 60% of ARKLA's volume of sales is made to Arkansas. (Record excerpts, p. 74).

8. ARKLA maintains that the Commission's refusal to adopt its methodology is inconsistent with two cases decided after the instant case and involving the transmission, or "wheeling," of electrical power. In *Otter Tail Power Co.*, Docket Nos. ER77–5 and E–8152, Opinion No. 93, issued Aug. 15, 1980, and *Minnesota Power & Light Co.*, Docket Nos. ER76–8278, ER77–427, Opinion Nos. 86–A and 87–A, issued Sept. 15, 1980, the Commission refused to separate the function of electric transmission from the utility's business as a whole involving genera-

tion as well as transmission. If there is any inconsistency between the instant case and *Otter Tail* and *Minnesota Power & Light Co.*, the inconsistency should be explained in the latter cases. The FERC's activities in the instant case were consistent with its prior decisions dealing with natural gas. Moreover, it is not clear that the cases cited by ARKLA are inconsistent with the instant case since they deal with the generation and transmission of electric power, activities which may be significantly different from the natural gas business.

9. In symbolic notation, the DCF method utilizes the formula, $K = (D/P) + G$, where $K$ is the cost of equity, $D$ is the current annual dividend amount, $P$ is the current market price of the stock, and $G$ is the growth rate of the stock. (Record excerpts, p. 3469).

made by ARKLA to adjust its DCF analysis for the risk of the transmission portion of ARKLA's operations or to show that such a risk adjustment is unnecessary. The latter reason is essentially the same reason the Commission gave for rejecting ARKLA's comparison with the sixteen other integrated companies. Similarly, we find the Commission's rationale here to be reasonable. We express no opinion with respect to the first reason relied upon by the Commission.

## IV.

The crux of ARKLA's argument is that in setting the zone of reasonableness, the Commission failed to adhere to the comparable earnings test and the attraction of capital test. The Commission not only rejected the recommendations proffered by ARKLA, but also similarly rejected the recommendations proffered by the staff.[10] The Commission refused to give substantial weight to ARKLA's evidence because of a possible distortion in the assessment of risk associated with ARKLA's pipeline operations. Significantly, it did not indicate it was ignoring entirely ARKLA's evidence. The Commission concluded that the staff witness's group of pipelines had not been shown to be comparable to ARKLA.

Having rejected all proffered recommendations with respect to the rate of return, the Commission adopted the reasoning of the ALJ to establish a zone of reasonableness even though the Commission noted it had unspecified difficulty with the ALJ's reasoning. The ALJ stated that, based upon the record evidence, the zone of reasonableness ranged from 12% to 13.5%. The

ALJ, though, did not explain on what record evidence he relied. What is clear is that the ALJ established the high limit of the zone of reasonableness by noting that the highest rate of return on equity the Commission had allowed was 14%. Fourteen percent had been allowed in the *Nevada Power Co.* quartet,[11] and was granted to a utility in serious financial condition. The ALJ found that ARKLA had no financial problems of the same magnitude and was in fact relatively healthy. The ALJ noted that ARKLA's A and A + bond ratings, together with the fact that its stock has consistently had a market-to-book ratio of better than unity, attested to ARKLA's financial health. The ALJ accordingly concluded that ARKLA did not need the high rate of return allowed in *Nevada Power Co.*, and that, therefore, the upper limit on the zone should be substantially below 14%. He set the upper range on the zone of reasonableness of 13.5%.

In establishing the lower limit on the zone of reasonableness, the ALJ took judicial notice that "the annualized cost-of-living index is in the vicinity of 12%." The ALJ accordingly set the lower limit on the zone of reasonableness at 12%, an amount the ALJ stated was "slightly above the current inflation rate."

After the Commission had established the zone of reasonableness, it reduced the specific allowed rate of return from the 12.75% allowed by the ALJ to 12.5%. The Commission stated that strong support for the result could be found in the fact that ARKLA had been awarded the same rate of return in an opinion issued five months earlier in a

10. The staff witness compared ARKLA with major Class A and Class B natural gas pipeline companies. A Commission publication entitled "Statistics of Interstate Natural Gas Pipeline Companies," defined major Class A and Class B natural gas pipeline companies as those which, during the preceding calendar year, had engaged in sales for resale, interstate transportation or storage for compensation of a volume of natural gas exceeding 50Bcf (Record excerpts, p. 3463). ARKLA is neither a major Class A nor a major Class B pipeline. The Commission rejected the staff's presentation because the staff had not shown that major Class A and B pipelines as a group are repre-

sentative of the risks attributable to ARKLA's pipeline operations.

11. The *Nevada Power Co.* quartet consists of *Nevada Power I*, Docket No. E–8721, Opinion Nos. 768 and 768–A, issued July 7, 1976, and Sept. 3, 1976, respectively; *Nevada Power II*, Docket No. E–9104, Order Affirming Initial Decision, issued July 21, 1977; *Nevada Power III*, Docket No. ER76–40, Order issued July 1, 1977; and *Nevada Power IV*, Docket No. ER76–875, Order, issued June 27, 1978. The *Nevada Power Co.* quartet was affirmed in *Nevada Power Co. v. FERC*, 589 F.2d 1002 (9th Cir. 1979).

transportation case and that there were no significantly different circumstances between that case and the one on review. *Arkansas-Louisiana Gas Company*, Docket No. RP75–32, Opinion No. 601, issued Aug. 9, 1979.

In attacking the upper limit of the zone of reasonableness, ARKLA argues that the comparable earnings test and the attraction of capital test have not been complied with by the Commission. ARKLA maintains that these two tests require the Commission to make comparisons with the returns actually earned by comparable companies. It is never proper, ARKLA maintains, for the Commission to rely solely on rates of return allowed in prior cases.[12] Otherwise, ARKLA argues, the rate of return allowed by the Commission will be established by circular reasoning, with no grounding in comparison with actual companies competing in the real market for investment dollars.

ARKLA is mistaken in two ways. First, ARKLA is mistaken that the Commission relied only upon rates of return allowed in prior cases. The Commission indicated that it would not give "substantial weight" to ARKLA's evidence, but did not indicate it would give no weight to the evidence. This evidence spanned 8 years and showed 16 companies earning a wide range of return.[13] ARKLA's witness indicated that the "mid-range" of return for these companies over the 8 years was 15.32%. (Record excerpts, p. 78). The Commission concluded that the rates of return for these integrated companies represented a difference in risk as compared to ARKLA's risk with respect to its jurisdictional sales. The Commission did not specify what this difference was, but it is clear that the Commission concluded that the risk of the sixteen companies was greater since it allowed ARKLA a lower rate of return. We do not suggest that this reasoning, to support the upper limit of the zone of reasonableness is strong, but it nevertheless adds some support to the reasonableness of the Commission's action.

ARKLA is mistaken in a second way. It is not the law that the Commission may set a rate of return only by comparison to the actual earnings of comparable companies. The Supreme Court has noted that "it is the result reached and not the method employed which is controlling." *FPC v. Hope Natural Gas Co.*, 320 U.S. at 602, 64 S.Ct. at 287. This circuit has stated several times that the comparable earnings and attraction of capital tests are neither exhaustive nor exclusive and that the Commission may set just and reasonable rates without reference to these standards. *United Gas Pipe Line v. FERC*, 618 F.2d at 1133–34; *El Paso Natural Gas Co. v. FPC*, 449 F.2d 1245, 1251–52 (5th Cir. 1971); *Southern Louisiana Area Rate Cases v. FPC*, 428 F.2d 407, 424, n.38 and at 435, n.87 (5th Cir.), *cert. denied*, 400 U.S. 950, 91 S.Ct. 241, 27 L.Ed.2d 257 (1970). *See also In re Hugoton-Anadarko Area Rate Case*, 466 F.2d 974, 983–89 (9th Cir. 1972). In *Permian Basin Area Rate Cases*, the Supreme Court approved of the Commission's actions when it relied chiefly upon the rates of return that had recently been allowed to other interstate pipelines in establishing the rate of return in that case. 390 U.S. at 806, 88 S.Ct. at 1380. Similarly, in *El Paso Natural Gas Co.*, the Commission

---

12. ARKLA correctly notes that both the Commission and the ALJ overlooked the fact that in *United Gas Pipe Line Co.*, Opinion No. 16, 26 P.U.R.4th 88 (July 3, 1978), *aff'd sub nom. United Gas Pipe Line Co. v. FERC*, 618 F.2d 1127 (5th Cir. 1980), the Commission had allowed a 15% return on equity. *United Gas Pipe Line*, though, involving a unique set of facts in which the utility had not only a difficult supply outlook and a thin equity ratio, but also had only recently been spun off from a major company. The Commission was in the process of investigating the spin-off. The Commission concluded that these factors dictated that United earn a higher rate of return than would ordinarily be realized on alternative investment earnings. Because of the extraordinary circumstances in *United Gas Pipe Line*, very dissimilar from ARKLA's condition, the failure by the Commission and the ALJ to take notice of *United Gas Pipe Line Co.* was harmless.

13. The year and range of return are as follows:

| | |
|---|---|
| 1975 | 26.3% to 11.1% |
| 1974 | 22.5% to 4.3% |
| 1973 | 17.7% to 9.3% |
| 1972 | 18.2% to 9.6% |
| 1971 | 18.5% to 11.4% |
| 1970 | 19.0% to 11.6% |
| 1969 | 19.3% to 9.3% |
| 1968 | 20.1% to 10.4% |

assigned considerable weight to rates of return allowed to five other pipeline companies in recent rate-making proceedings. 449 F.2d at 1252.[14]

The above cases have established that rates of return allowed in prior cases may be a significant or a primary factor in the Commission's determination of the proper rate of return. While we are concerned that continuation by the Commission for too prolonged a time in a practice of relying primarily on allowed returns might deprive a rate of return decision of a rational relationship with market realities, we do not believe that problem exists here where the cases relied upon are recent and where those cases themselves established their allowed rate directly on the basis of evidence of market realities.[15] The Commission's reliance upon allowed rates of return is justified here where the Commission properly declined to give substantial weight to the evidence produced by ARKLA and the staff. Laboring under this handicap, the Commission reasoned as rationally as was possible under the circumstances to establish the upper limit of the zone of reasonableness. It looked to ARKLA's present financial condition and compared it with companies for which the Commission had given a 14% rate of return, the highest rate allowed in recent comparable cases. We conclude that the result reached in establishing the upper limit on the zone of reasonableness was a just and reasonable result.

With respect to the lower limit of the zone of reasonableness, ARKLA complains that the Commission has not adequately explained how it derived the lower limit of the zone of reasonableness from the current inflation rate.[16] It is well established that there must be sufficient indication in an agency's decision of the basis for its action so that a reviewing court may ascertain whether the agency action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S. C.A. § 706 (West 1977); *Estate of French v. FERC*, 603 F.2d 1158 (5th Cir. 1979). In this ratemaking context, to determine whether the agency's action is in accordance with law, there must be sufficient articulation of the Commission's reasoning for us to ascertain whether the end result is just and reasonable. We agree with ARKLA that the Commission's explanation here of the lower limit of the zone of reasonableness is inadequate.[17] While the Commission and the ALJ relied upon allowed rates of return to establish the upper limit on the zone of reasonableness, they curiously did not rely on allowed rates to establish the lower lim-

---

14. Our sister court, the Fourth Circuit, recently affirmed the Commission's significant reliance on allowed rates of return in establishing the zone of reasonableness. *Consolidated Gas Supply Corp. v. FERC*, 653 F.2d 129 (4th Cir. 1981).

15. *See* analogous concern over the proper use of allowed returns, expressed by the Fourth Circuit in *Consolidated Gas Supply Corp. v. FERC, supra.*

16. ARKLA does not argue that the Commission's official notice of the inflation rate was improper. In its petition for rehearing, ARKLA did object to the lack of evidence in the record to support the ALJ's estimate of the current inflation rate and to the lack of an opportunity to present evidence as to the arbitrariness of the ALJ's estimate. *(Record excerpts, p. 3501)*. Insofar as ARKLA meant by this objection to complain of judicial notice and to request an opportunity to · present rebuttal evidence, an objection by no means clearly made, ARKLA has not made this objection on appeal. Comparison should be made to cases in which courts have held that they and regulatory agen-

cies may take judicial notice on current rates of interest. *City of Cleveland v. FPC*, 525 F.2d 845 (D.C.Cir.1976); *In re Hugoton-Anadarko Area Rate Case*, 466 F.2d 974 (9th Cir. 1972); *Iberian Tankers Co. v. Gates Construction Corp.*, 388 F.Supp. 1190 (S.D.N.Y.1975). *See also Simpson v. United States*, 252 U.S. 547, 40 S.Ct. 367, 64 L.Ed. 709 (1920), where Supreme Court took judicial notice of what a fair rate of return is on invested money.

17. Unlike the Commission's finding with respect to the upper limit on the zone of reasonableness where we were able to discern a connection between the evidence offered by ARK-LA and the upper limit settled on by the Commission, *see supra* at pp. 441–442, we are able to discern no connection between the staff witness' evidence and the lower limit established by the Commission. The Commission rejected the staff witness' evidence because no showing of comparability had been made. Nor did the Commission offer even a rudimentary analysis of how ARKLA compared with the companies relied upon by the staff witness.

it.[18] We are only told that the "cost-of-living" index at the time was in the vicinity of 12%, without any indication as to which index was relied upon.[19] Accordingly, we cannot ascertain whether an appropriate index has been identified. We are not told whether the rate of which notice was taken was a monthly rate annualized, a rate calculated over an actual year's span, or a projected inflation rate.[20] Aside from the absence of any indication of whether an appropriate inflation rate has been utilized, the Commission has provided no explanation of its concept of the proper relationship between the appropriate inflation rate and the lower limit of the zone of reasonableness.[21] In addition to providing explanations of the foregoing kind on remand, we also request the Commission to clarify whether in setting the lower limit, it is relying upon the evidence adduced by the staff or other record evidence, and, if not, to explain how the appropriate inflation rate, by itself, can provide substantial evidence to establish the lower limit of the zone of reasonableness. We do not suggest that the lower limit established by the Commission is unreasonable, but we do have questions concerning the lower limit which we cannot resolve in the face of the Commission's inadequate discussion of how it arrived at the figure. Accordingly, we vacate and remand for a fuller discussion of how the Commission established the lower limit of the zone of reasonableness from the inflation rate.

Because the lower limit on the zone of reasonableness was a factor in the Commission's finding that the proper rate of return was 12.5% we must vacate its finding on the specific return as well. However, we note that if we had been able to affirm the Commission's establishment of a lower limit on the zone of reasonableness, we would have had no choice in this case but to defer to the Commission's discretion to select a rate within the zone of reasonableness. *In re Permian Basin Area Rate Case, supra.*

VACATED AND REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.

---

18. *Compare Consolidated Natural Gas Supply Corp. v. FERC, supra,* where the Fourth Circuit approved the Commission's reliance on allowed rates of return, together with independent market data to establish the lower limit on the zone of reasonableness.

19. Economists generally rely upon three traditional measures of inflation in the nation's economy—the Consumer Price Index and the Wholesale Price Index published by the Department of Labor, and the GNP implicit price deflator published by the Department of Commerce. Robert Webb, Utility Rate Base Valuation in an Inflationary Economy, 28 Baylor L.R. 823 (1976).

20. One expert has stated:
The current cost of capital, whether debt or equity, never includes a risk premium for past inflation. Only anticipated inflation, not already experienced inflation, is reflected in a market-determined cost of debt or equity capital.
Rhoades Foster, Fair Return Criteria and Estimation, 28 Baylor L.R. 883 (1976).

21. There is substantial opinion that in periods of stable inflation rates, there is a real yield on money above that inflation rate. *Doca v. Marina Mercante Nicaraguense,* 634 F.2d 30, 39 n.10 (2d Cir. 1980), *cert. denied,* —— U.S. ——, 101 S.Ct. 2049, 68 L.Ed.2d 351 (1981). *See* Fama, *Interest Rates and Inflation: The Message in the Entralls,* 67 Amer.Econ.Rev. 487 (1977). Although the Commission's opinion here implies that an appropriate rate of return must exceed the inflation rate, it has not explained why or by how much.